Tim KLING, et al.   Plaintiffs

v.

**MENTOR PUBLIC SCHOOL DISTRICT, et al.**
**Defendants**

Nos. 1:00CV3130, 1:01CV0204.

United States District Court,
N.D. Ohio,
Eastern Division.

April 3, 2001.

Amy S. Glesius, Barbara K. Besser, Bruce B. Elfvin, Elfvin & Besser, Kerry M. Agins, Nessa G. Siegel, Nessa G. Siegel Co., LPA, Cleveland, OH, for Plaintiffs.

Karin W. Rilley, Susan S. McGowan, Britton, McGown, Smith, Peters & Kalail,

Cleveland, OH, for Defendant Mentor Public School District.

John A. Podgurski, Dinn, Hochman, Porter & Levy, Cleveland, for Defendant Mayfield City School District.

Steven L. Craig, Heichel, Craig & Prelac, Canton, for Defendant Ohio High School Athletic Association.

Michael Kirkman, Susan G. Tobin, Ohio Legal Rights Service, Columbus, for Interested Party Ohio Legal Rights Service, Amicus Curiae.

## MEMORANDUM OF OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

WELLS, District Judge.

This case is before the Court on a motion for a preliminary injunction filed on 5 February 2001 by plaintiffs Tim Kling, Kathy Kling, and their son Jeffrey Kling.[1] On 18 February 2001, defendant Mentor Public School District ("Mentor") filed a brief in opposition to the plaintiffs' motion for a preliminary injunction .[2] On 22 February 2001, this Court granted Mentor's motion to join the Mayfield City School District ("Mayfield") and the Ohio High School Athletic Association ("OHSAA") as necessary parties. On 23 February 2001, the Ohio Legal Rights Service was granted leave to file, and did file, an amicus brief.[3] OHSAA filed its brief in opposition to the plaintiffs' motion for a preliminary injunction on 2 March 2001, and Mayfield filed its brief in opposition on 5 March 2001.

The case came on for a hearing on 8 March 2001 at 2:00 p.m. The parties submitted a joint stipulation of facts, and offered both oral argument and in-court testimony. Upon consideration of the entire

---

1. On 18 December 2000, the Klings filed suit in this Court, requesting designation as a "prevailing party" for purposes of attorneys' fees. (Case No. 1:00 CV 3130). The Klings further requested that this Court, under provisions of the Individuals with Disabilities Education Act, require Jeffrey's participation on the Mayfield track and cross-country teams. On 5 February 2001, the plaintiffs filed a motion for a temporary restraining order asking this Court to compel defendant Mentor Public School District to allow Jeffrey to compete on the Mayfield High School track and cross-country teams. The motion for a temporary restraining order was denied. On 23 January 2001, Mentor filed both a counterclaim and a separate action, seeking an independent review of the State Level Review Officer's decision pursuant to 20 U.S.C. § 1415. (Case No. 1:01 CV 0240). Upon Mentor's motion, the two cases were consolidated on 20 February 2001.

2. In its brief in opposition, Mentor contends the "Klings seek premature enforcement of a decision of the State Level Review Officer's (SLRO) decision. The Klings seek to use this Court's extraordinary powers to bypass the State Education Agency without showing evidence of attempts to seek enforcement of the SLRO order through the State Education Agency." (Docket No. 25 at 1–2). At the 8

March 2001 hearing, however, the Klings called Ann Cooper of the Ohio Department of Education (the "Department") to testify. Ms. Cooper acknowledged she had specific responsibilities regarding monitoring school district compliance with orders of state level review officers, and she was familiar with the Kling due process review. Her testimony also showed that plaintiffs' counsel had contacted her to ask whether, "after the state level review officer issued his decision, ... [she] would enforce the order?" According to Ms. Cooper, she had replied that the Department would only enforce the SLRO's order if there were a change in placement and that the Department's position was that this case did not involve a change in placement. Ms. Cooper further testified the Department had taken no action to enforce the SLRO's order. (3/8/01 Hring). Given Ms. Cooper's testimony, the Court finds that the Klings have sought enforcement through the State Education Agency and that the case is properly before this Court.

3. The amicus brief in the main discusses the "stay-put" provision set forth at 20 U.S.C. § 1415(j). On the facts of this case, however, this provision does not apply.

record in this case; all briefs filed prior to the 8 March 2001 hearing; all testimony, exhibits, and oral argument presented at that hearing; and for the reasons which follow, the plaintiffs' motion for a preliminary injunction will be granted.

## I. *Findings of Fact*

1. Jeffrey Kling, the son of Tim and Kathy Kling, was born on 14 July 1981 with a hearing impairment and cerebral palsy. (Stipulations of the Parties (Docket No. 45) ¶¶ 1, 4–5).

2. Jeffrey's hearing impairment is described as "bilateral severe to profound sensori neural loss in acuity." His cerebral palsy impairs his fine and gross motor skills. (Stips. ¶¶ 4, 8).

3. Jeffrey's intelligence tests yield standard scores which fall within the average range of functioning. (Stips. ¶ 10).

4. In 1982, Jeffrey was formally identified as a child with a disability within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401, *et seq.* (Stips. ¶ 7).

5. Jeffrey resides in the Mentor Public School district but attends Mayfield High School in the Mayfield City School District and is currently in his junior year. (Stips. ¶¶ 3, 6).

6. Under the IDEA, as the school district of Jeffrey's residence, Mentor is responsible for ensuring that Jeffrey receives a free appropriate public education ("FAPE") and an Individualized Education Plan ("IEP").[4]

7. In early 1972, Mayfield, Mentor, and thirteen other area schools districts (the "Participating School Districts") entered into a "Supplemental Agreement." Under this Agreement, Mayfield agreed to provide, manage and operate an "upper school program" for hearing impaired students who lived in the Participating School Districts. (Ex. A to Mayfield's Br. in Opp'n.)

8. Mentor placed Jeffrey in the Auditory–Oral program at the Mayfield City School District for the provision of all special education and related services. (Stips. ¶ 6).

9. Section 1 of the Supplemental Agreement states that "Mayfield will admit all eligible hearing impaired students, grades 6 through 12, who are residents of the Participating School Districts." (Ex. A to Mayfield's Br. in Opp'n.) Section 4 states that Mayfield is responsible for the management, administration, and operation of the special education program. In addition, it is "the applicant for and recipient of all state and federal aid applicable to the upper schools program and any gifts and grants with respect thereto, and ... keep[s] all records and prepare[s] and submit[s] all reports required by law with respect to such program." (Ex. A § 4).

10. Because of Jeffrey's disabilities, he did not start second grade until he was approximately ten years old. According to his father, he "was fighting things like not being able

---

4. As discussed more fully below, an IEP is a collaborative effort of an IEP team consisting of a qualified representative of the local education agency, the child's teacher, the child's parents, and, where appropriate, the child. 20 U.S.C. § 1414(d). Together, the team members set out the location and scope of the services the disabled student will receive, the student's needs and goals, and "the strengths of the child and the concerns of the parents for enhancing the education of their child." 20 U.S.C. § 1414(d).

to hold a pencil and eye muscle operations where his eyes would go in every direction. At that time his hearing impairment was dropping from a 40 decibel loss to a 90 decibel loss.... Since the second grade he has not been held back at all," (IHO Tr. at 37–38, adopted by this Court), and he is scheduled to graduate in 2002.

11. Jeffrey is still in high school at the age of 19 only because his dual disabilities prevented him from beginning second grade until the age of ten.

12. During the 1998–1999 school year—when Jeffrey was in the 9th grade—his physical education teacher required him and his classmates to complete a one-mile run. It took Jeffrey the entire grading period to accomplish the requirement. (IHO Tr. at 41–42 (T. Kling), adopted by this Court).

13. In the spring of 1999, Jeffrey's physical education teacher, Mrs. Baron, suggested he try out for cross country and track. (Stip. ¶ 13; IHO Tr. at 41–42 (T. Kling)).

14. Jeffrey spent the summer of 1999 in training with his father for cross country and track. (Stips.¶ 13).

15. In 1999, and pursuant to 20 U.S.C. §· 1414(a)(2), Mayfield personnel conducted a triennial "Multifactored Evaluation Team Report." On 2 June 1999, the report was signed by Cynthia Lindberg, Mayfield's school psychologist; Adrienne Stanley, the Department Chair and Coordinator of the Secondary Hearing Impaired Program at Mayfield; Vickie Adamus, a teacher of the hearing impaired at Mayfield; and Mr. and Mrs. Kling. (Mentor Ex. 15).

16. The Evaluation Report states that Jeffrey continues to meet the federal definition of a student with a hearing handicap. The report also summarizes the effects of Jeffrey's disabilities on his educational performance as follows: "Jeff's hearing impairment continues to negatively affect his school performance. He does have a good attitude towards school and average ability, which has helped his academics. He continues to need assistance in some areas in order to maintain his current levels of success." (Stips.¶ 11).

17. During the 1999–2000 school year, Jeffrey joined and participated in both the cross-country and track teams (the "Teams"). (Stip.¶ 14).

18. Jeffrey's participation on the cross-country and track teams resulted in notable improvements in both his academic work and his sense of personal well-being. (Petr's Ex. 12 to IHO Hring; IHO Decision at 10–12; IHO Tr. at 45–52 (Kling); IHO Tr. at 437–45 (Jensen); 3/8/01 Hearing Tr. (T. Kling)).

19. Mayfield is a member of OHSAA, a private, voluntary association of public and private high schools and 7th and 8th grade schools throughout Ohio. (OHSAA Ex. 1).

20. OHSAA's Constitution and its Bylaws can be changed only by a majority vote of the principals of all the member schools, both public and private.

21. OHSAA "regulates, supervises and administers interscholastic athletic competition among its member schools." (Stip.¶ 16).

22. Under OHSAA Bylaw 11–2–2, "[a]ll regular season contests in which ineligible players have participated

shall be forfeited." (OHSAA Ex. 1).

23. OHSAA Bylaw 12–1–1 gives the Commissioner of the OHSAA authority to impose penalties for violation of the OHSAA bylaws or regulations. "Penalties include: suspension, forfeiture of games, forfeiture of championship rights, probation, public censure, denial of participation or fines not to exceed $1000 per occurrence." (OHSAA Ex. 1).

24. If a school has been suspended, other "[m]ember schools of the Association shall not compete" with that school. (OHSAA Ex. 1, Bylaw 13–1–1).

25. At the end of the 1999 cross-country track season, Steve Canfield (Mayfield's cross-country coach) and James Dasher (Mayfield's Athletic Director) informed Jeffrey's father that OHSAA regulations would make it impossible for Jeffrey to participate during the next school year because he would turn nineteen prior to 1 August.

26. Under OHSAA Bylaw 4–2–1, "[i]f a student enrolled in high school attains the age of 19 before August 1, that student shall be ineligible to participate in the high school interscholastic athletics for the school year commencing in that calendar year." (the "Age 19 Rule"). (Stips. ¶¶ 15–16; IHO Tr. at 69 (T. Kling)).

27. The purposes of the Age 19 Rule are to prevent unfair advantage to one team or one team member, to help ensure the safety of all players, and to give every school a level playing field. (IHO Tr. at 354–59 (Schumacher); IHO Tr. at 763–64 (Muscaro); 3/8/01 Hring (Muscaro)).

28. OHSAA's rules—including the Age 19 Rule—serve a valid and important purpose.

29. Jeffrey became 19 years old on 14 July 2000. (Stips. ¶ 17).

30. Because Jeffrey typically finishes last in track meets, there is virtually no likelihood that he, even at ages 19 or 20, will dominate the field. As a result, Jeffrey's participation on Mayfield's cross-country and track teams will not likely provide an unfair advantage for the Mayfield City School District team. (IHO Tr. at 299, 306–07 (Canfield)).

31. In the spring of 2000, the members of Jeffrey's IEP team began formulating Jeffrey's IEP for the following year, with an IEP meeting scheduled for 5 April 2000. (Stips. ¶¶ 20–21).

32. Several weeks before the 5 April 2000 meeting, Jeffrey's parents sent to the IEP team a proposed set of goals and objectives the parents wished the team to consider at the meeting. Among those goals was the following: "Jeff will improve his self-image by full participation on the cross country team including practices and competitions." (Stips. ¶ 21; Pls' Ex. 10).

33. During the 5 April 2000 meeting, the other IEP team members refused to consider the Klings' proposed goals and objectives "in a significant or meaningful manner.... To the extent the goals and objectives proposed by the Klings were discussed, the IEP team's focus was on OHSAA's age 19 rule, rather than the need for or benefit to Jeffrey." (IHO Decision at 10; IHO Tr. at 62 (Kling); IHO Tr. at 196 (Stanley); IHO Tr. at 262–63 (Kallmeyer); IHO Tr. at

398, 402–03 (Dasher); IHO Tr. at 839 (Paxton)).

34. On 18 May 2000, Ron Patrick, Director, Psychological and Student Services, Mentor Public Schools, sent a letter to the Klings, stating that Jeffrey's IEP would not include a track component "because it is believed that Jeff can attain educational benefits without including track as a component for special education or as a transitional program, related service, and/or as supplementary aid and services. Per the rules of the Ohio High School Athletic Association, athletic eligibility can be attained only if the IEP mandates participation and it is deemed necessary to Jeff's progress." (IHO Tr. at 148–55; Petr's Ex. 12 to IHO Hring; IHO Decision at 10–11).

35. The Klings did not sign Mentor's proposed IEP for the 2000–2001 school year. (Stips.¶ 22).

36. On 23 May 2000, the Klings formally requested an impartial due process hearing pursuant to O.R.C. § 3323.05(E) and the IDEA. (Stips.¶ 23).[5]

37. The due process hearing was conducted before a hearing officer referred to at 34 C.F.R. § 300.508 as an "Impartial Hearing Officer" ("IHO"), Joy M. Freda. The hearing took place over six days in August of 2000 and included testimony from the Klings, Jeffrey's teachers, administrators, fellow members of the cross-country and track teams, and psychologists.

38. On 29 August 2000, Mr. Kling signed an IEP for Jeffrey with effective dates of 29 August 2000 to 11 June 2001. However, Mr. Kling added the following notation: "My signature gives consent for the District to implement the academic portion of this IEP. All other issues regarding speech services, social skills, psychological and emotional development, physical skills, Jeff's diagnosis of cerebral palsy, and Jeff's participation in cross-country and track will be determined by Hearing Officer Joy Freda on September 12, 2000 as recognized by the District in footnote 5 of its post-hearing brief." (Mentor's Ex. A).

39. An IEP meeting was held to draft Jeffrey's 2000–2001 IEP on 6 September 2000. (Stip.¶ 28). The IEP begun on that date was not completed. (Tr. of 2/2/01 IEP Mtg. at 6).

40. After the parties submitted post-hearing briefs, the IHO issued her decision on 26 September 2000. The decision contained seventy findings of fact. (IHO Decision; IHO Tr.).

41. The IHO found in favor of the Klings. Her conclusions of law contained the following:

12. The IEP developed by the Respondent for the 2000–2001 school

5. To receive financial assistance under the IDEA, a state or local educational agency must "establish and maintain procedures ... to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). If a child's parents believe proper procedures have not been followed, the parents "have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f).

year is not reasonably calculated to enable the child to receive education benefit and denies him [a free appropriate public education ("FAPE")] under IDEA.

13. Based on the credible testimony of Petitioners' expert witnesses, and particularly Dr. Jensen, [a clinical psychologist], participation in interscholastic athletics, i.e., track and cross-country, is a necessary component of Jeffrey's IEP, without which he cannot attain educational benefit or FAPE.

(IHO Decision at 14).

42. The IHO ordered the following relief:

1. The IEP team shall reconvene at the earliest possible time to develop an appropriate IEP for Jeffrey for the 2000–2001 school year.

2. Such IEP shall be predicated on all relevant information as contemplated by IDEA including the reports of Drs. Henry, Jensen and Stewart.

3. Such IEP shall establish appropriate goals and objectives for Jeffrey Kling to address development of his communication skills, social and psychological needs (including promotion of self-esteem), and development of his gross and fine motor skills.

4. In order to address the skills delineated at item (3) above, at least in part, such IEP shall contain an interscholastic athletics component which places Jeffrey Kling on the Mayfield High School cross-country and track teams.

(IHO Decision at 14).

43. The IHO's decision was carefully reasoned and was tied tightly to the testimony she heard over the course of a six-day hearing, including the testimony of three expert witnesses.

44. During the IHO hearing, the Klings presented compelling testimony concerning the salutary effect of competition on Jeffrey's personal and academic growth.

45. Although all three experts opined during the IHO hearing that Jeffrey would benefit from participating on the track team, all further stated that mere participation would not be enough. (IHO Decision at 33–36; IHO Tr. at 702 (Henry); IHO Tr. at 906–07; 913 (Stewart); IHO Tr. at 442–43 (Jensen)). Dr. Jensen, for instance, emphasized the difference between the physical activity of running and membership in a team.

I emphasize the difference between the physical activity of running and performing ... and being a team member. The extrinsic rewards that one secures by participating in high school athletics are of much greater weight to a high school person than is the benefit that you experience by jogging, so to speak. There are awards. There are times that you improve upon from meet to meet to race to race. There are team photos that end up in the yearbook. There are post-event activities that team members are invited to on a selective basis. These less extrinsic rewards are of greater importance when compared to the act of running, so I would say being allowed to practice will pale in comparison to actual team membership in terms of benefits.

(IHO Tr. at 444–45).

46. Jeffrey's father testified at the IHO hearing about how Jeffrey's attitude, his self-esteem, and his schoolwork improved after he joined the team.

He could carry himself better. He felt proud of his accomplishment of

being on the team and he felt proud of being able to finish the race even though he was coming in last.

. . .

He took the courage to ask a girl out for a date. He had never done that before. He attempted to and was successful applying to join student council and so he had a lot more confidence in himself.

. . .

[Jeffrey] chose to study very hard for his ninth grade proficiency and he managed to pass the math one, which is very difficult for many students. He passed the science, which is difficult, and he came very, very close I believe on the writing one. He just missed the writing one by a couple of points.

(IHO Tr. at 45–51).

47. Jeffrey's mother testified at the hearing that Jeffrey now "carries himself with more pride .... I have seen him following along in the newspaper the athletics that Mayfield was participating in.... He got his temporary driver's license since he decided he was going to go out for cross-country." (IHO Tr. at 93–94).

48. When the IHO ordered that Jeffrey be allowed to compete, she inadvertently placed both Mentor and Mayfield in what must have appeared to them to be an untenable situation.

49. The IHO ordered one independent school district, Mentor, to tell another independent school district, Mayfield, how to treat a student. Mentor's position was that it had no authority to do so, and Mayfield concurred.

50. The effect of the IHO's decision was to hand Jeffrey a Pyrrhic victory. Even assuming Mentor could order Mayfield to allow Jeffrey on the cross-country and track teams, his presence would—as the situation then stood—cause those teams to forfeit their eligibility under the OHSAA bylaws. If ineligible, there would be no competitions in which any of their students, including Jeffrey, could participate, and more than one person would suffer as a result. Jeffrey's teammates would lose their opportunity to participate in their chosen sports, some might lose the chance to participate in state competitions, and some might lose the opportunity to apply for college sports scholarships. (IHO Tr. at 403–04 (Dasher)).

51. Despite the plaintiffs' assertion that the defendants have attempted "to undermine and undo Plaintiff's educational rights ... by merely making random decisions to deny school to young people," (Docket No. 15 at 10), there is no evidence to support this characterization—particularly given the problematic and uncertain situation with which the schools were faced.

52. Mentor filed a timely appeal from the IHO's decision for State Level Review.[6]

---

6. The Klings appealed the IHO's third conclusion of law which states as follows:

To the extent that Petitioners' issue No. 5 is predicated on an application of Ohio Revised Code Section 3313.535 to the current fact pattern, such reliance is misplaced. Boards of education are creatures of stat-

ute, and this provision applies to a narrowly-drawn set of circumstances which are inapposite to the present due process matter.

On 30 October 2000, however, the Klings withdrew their appeal. (SLRO Decision at 6, 8).

53. In an order dated 8 December 2000, the State Level Reviewing Officer ("SLRO") on consideration of further briefs by both parties and upon independent review of the entire record, affirmed the IHO's decision in its entirety. (SLRO Decision at 15).

54. Among other things, the SLRO concluded the following:

The IHO herein clearly found Petitioners' witnesses to be more credible with respect to the issue of whether interscholastic athletics are a necessary part of Jeffrey's IEP in order to provide him with FAPE. This SLRO defers to the IHO's determination with respect to such finding.

(SLRO Decision at 15).

55. Today, Jeffrey is on the student council. He is now allowed to practice, travel, and attend weekly dinners, but not compete, with the teams. Thus he has gained some opportunity to improve his physical coordination and his communication skills during the cross-country and track seasons.

56. Jeffrey's report cards do not show he has suffered academically this year. At the end of the first semester of 1999–2000 school year, Jeffrey received one "D," two "Cs," three "Bs," and a "Pass," giving him a cumulative grade point average ("GPA") of 2.39. At the end of the first semester of the 2000–2001 school year, he received one "D," two "Cs," one "B," two "As" and one "Pass," giving him a quarterly GPA of 3.09 and a cumulative GPA of 2.482. (Jt.Exs.2–3). With this GPA, Jeffrey was placed on the honor roll for the first semester. (Mentor's Ex. E).

57. Following the SLRO's decision, Jeffrey's IEP team met on 2 February 2001.[7]

58. At the February meeting, the reports of the three experts who testified at the IHO hearing—Drs. Jensen, Stewart and Henry—were incorporated into Jeffrey's IEP. (Tr. of 2/2/01 IEP Mtg. at 11–15). The team discussed Jeffrey's proposed IEP thoroughly and at length, reaching consensus on all major elements of the IEP except the issue of Jeffrey's participation on the cross-country and track teams. (Tr. of 2/2/01 IEP Mtg.).

59. Also at the February meeting, all members of the IEP except the Klings (the "School Members") reiterated their belief that Jeffrey could attain FAPE without competing in cross-country and track meets. (Tr. of 2/2/01 IEP Mtg., Docket No. 51).

60. The School Members of the IEP, however, refused to implement the SLRO's decision in that they declined to develop an IEP containing

---

7. The members of the team were as follows: Vickie Adamus, a teacher of the hearing impaired at Mayfield; Robert Clamplitt, Special Services Director for Mayfield Schools; Pat Cronin, Coordinator of Special Education for the Mentor Public Schools; Danielle Kallmeyer, a special needs teacher at Mayfield; Cynthia Lindberg, Mayfield School Psychologist; Barbara Palmer, Vocational Rehabilitation Counselor; Tim Paxton, a teacher of the hearing impaired at Mayfield; Janet Rosinski, a mathematics teacher at Mayfield; Lorraine Snevel, District Physical Therapist; Adrienne Stanley, Department Chair and Coordinator of the Secondary Hearing Impaired Program at Mayfield; and Timothy, Kathleen and Jeffrey Kling. Also in attendance were counsel for the Klings, Nessa Siegel, Barbara Besser, Kerry Agins; counsel for Mentor, Susan McGown and Karen Rilley; and counsel for Mayfield, John Podgurski. (Tr. of 2/2/01 IEP Mtg., Docket No. 51).

"an interscholastic athletics component which place[d] Jeffrey Kling on the Mayfield High School cross-country and track teams." (IHO Decision at 14; Tr. of 2/2/01 IEP Mtg., Docket No. 51).

## II. *Conclusions of Law*

A. Courts must consider four factors when deciding whether a preliminary injunction is warranted:

1. Whether the plaintiffs have shown a strong likelihood or probability of success on the merits;

2. Whether the plaintiffs have shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others;

4. Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Assoc. v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977). These factors do not "establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief. Instead, the district court must engage in a realistic appraisal of all the traditional factors weighed by a court of equity." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354, 1356 (6th Cir.1985).

B. The IDEA provides federal money to assist state and local agencies in educating handicapped children. In order to qualify for that money, a state must demonstrate that it "has in effect a policy that assures all handicapped children a right to a free appropriate public education."

C. A disabled child's right to a free and appropriate public education is assured by the development of an individualized education plan. The IEP is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents and, where appropriate, the child. 20 U.S.C. § 1414(d).

D. In addition to FAPE, the IDEA provides parents with a number of procedural safeguards, including the right to a place on the IEP team, the right to examine their child's records, and an opportunity to present complaints with respect to their child's educational placement. 20 U.S.C. §§ 1414(d)(1)(B)(i), 1415(b)(1), (6).

E. Parents have the right to an "impartial due process hearing" before a local educational agency. 20 U.S.C. § 1415(f). "Any party aggrieved by the findings and decision rendered in such a hearing may appeal" first to the state educational agency and then to either state or federal court. 20 U.S.C. § 1415(g), (i).

F. The court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

G. Mentor has complied with the IHO's order insofar as the IEP team "was reconvene[d] at the earliest possible time to develop an appropriate IEP for Jeffrey for the 2000–2001 school year." (IHO Decision at 14).

H. Mentor has complied with the IHO's order insofar as the IEP was "predicated on all relevant information as contemplated by IDEA including the reports of Drs. Henry,

Jensen and Stewart." (IHO Decision at 14).

I. Mentor has partially complied with the IHO's order to establish "appropriate goals and objectives for Jeffrey Kling to address development of his communication skills, social and psychological needs (including promotion of self-esteem), and development of his gross and fine motor skills." (IHO Decision at 14).

J. Mentor has not complied with the IHO's order to address the skills set forth in Paragraph 61 insofar as Jeffrey's IEP does not have "an interscholastic athletics component which places Jeffrey Kling on the Mayfield High School cross-country and track teams." (IHO Decision at 14).

K. Courts have interpreted the IDEA to require what the Sixth Circuit has called a "modified de novo" standard of review. *Doe v. Metropolitan Nashville Public Schs.*, 133 F.3d 384, 386 (6th Cir.1998); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir.2001).

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to those proceedings.

Therefore, a court's inquiry in suits brought under § 115(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

*Hendrick Hudson Cent. Sch. Distr. Bd. of Education v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

L. The 1997 amendments to the IDEA have not affected these standards.

M. District courts are to undertake an independent examination of the entire record, giving "due weight" to the state proceedings but reaching an "independent decision based on a preponderance of the evidence." *Id.* at 205–06, 102 S.Ct. 3034; *see also Doe*, 133 F.3d at 387; *Knable*, 238 F.3d 755, 764.

N. Given the decisions of the IHO and the SLRO, the required level of deference this Court must show to those state decisions, and upon independent review of the entire record, including evidence presented prior to and during the 8 March 2001 hearing, this Court concludes the plaintiffs have shown a probability of success on the merits. *Rowley*, 458 U.S. at 207–07, 102 S.Ct. 3034.

O. The first factor in the four-factor balancing test therefore weighs in favor of the plaintiffs.

P. The Klings have not established irreparable harm at the level their strident claims assert. (Docket No. 15 at 8).

Q. However, on the particular facts of this case, the Klings have shown

Jeffrey has suffered irreparable harm insofar as he has been excluded from competition and relegated to merely suiting up and practicing. Jeffrey was encouraged by school officials to prepare, join, and participate fully in the teams. His participation resulted in academic, physical, and personal progress. Jeffrey has run afoul of the Age 19 Rule only because of his disabilities. His particular disabilities are specifically covered by the protections of the IDEA. Upon comprehensive review, both state levels of administrative review found that Jeffrey should be placed back on the Mayfield teams regardless of his age.

R. All necessary parties are before this Court.

S. What the defendant schools could do only by penalizing all children in their systems and leaving Jeffrey with an empty victory, this Court now has the authority and responsibility to do pursuant to the IDEA and this Court's equitable power. *Crocker v. Tennessee Secondary Sch. Athletic Ass'n,* 735 F.Supp. 753, 760 (M.D.Tenn.1990); *aff'd,* Case Nos. 89–6450, 89–6451, 1990 WL 104036 (6th Cir. July 25, 1990).

T. Under the particular facts of this case, OHSAA should not be permitted to override the state hearing and appeals officers whose due process review Jeffrey is entitled to under the IDEA by sanctioning the schools for violating the Age 19 Rule.

U. If Jeffrey is allowed to compete on Mayfield's track or cross-country teams, the defendants will not be irreparably harmed.

V. Upholding Jeffrey's rights under the IDEA with the issuance of a preliminary injunction need not cause substantial harm to others.

W. Under the particular circumstances of this case, the "irreparable-harm" factor and the "injury-to-others" factor in the four-factor balancing test therefore weigh slightly in favor of the plaintiffs.

X. Because at this stage of this litigation the case rests on its unique set of facts, allowing Jeffrey Kling to compete need not and will not effect "a fundamental alteration in Ohio's student athletic rules." (Docket No. 25 at 14).

Y. The "public interest" factor in the four-factor balancing test therefore weighs in favor of neither party.

Z. Because the plaintiffs have shown a probability of success on the merits and because, under the circumstances of this case, the "irreparable harm" and "injury-to-others" factors favor the plaintiffs, and because the remaining factor favors neither party, a preliminary injunction is warranted.

## IV. *Conclusion*

For the reasons set forth above, THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION IS GRANTED, AND, SUBJECT TO FURTHER COURT ORDER:

• So long as this Order is in effect, the Commissioner of OHSAA and all OHSAA officials are enjoined from sanctioning Mayfield Public School District and/or Mentor Public School District in any way for allowing Jeffrey Kling to participate fully on the Mayfield High School cross-country and track teams.

• Jeffrey Kling's IEP shall be revised forthwith pursuant to the IHO order to contain an interscholastic athletics com-

ponent and to place him on the Mayfield High School track and cross-country teams.

• Mayfield High School immediately shall permit Jeffrey Kling to participate fully in Mayfield High School's track and cross-country teams, including competition.

IT IS SO ORDERED.